UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES,

    Plaintiff,

v.

JOSEPH E. FELDMAN,

    Defendant.

Case No. 2:17-cv-11292
Honorable Laurie J. Michelson
Magistrate Judge David R. Grand

## OPINION AND ORDER
## DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [36]

In 2001 and 2002, Joseph Feldman profited from making and using counterfeit checks. He used the phony money for everything from purchasing personal items to funding brokerage accounts. And he didn't file tax returns. Eventually the federal government caught on, and in 2006 Feldman pled guilty to wire fraud. In 2010, Feldman completed his prison term.

But apparently there is some truth in the saying, "nothing is certain except for death and taxes." Over 10 years after Feldman pled guilty, the Internal Revenue Service filed this lawsuit to collect on unpaid taxes for money Feldman received in 2001 and 2002. In particular, the IRS says that Feldman now owes around $200,000 in taxes, interest, and penalties.

And the IRS says that every reasonable jury would agree with it and so this Court should grant it summary judgment. But the Court believes that there is a genuine dispute over how much income Feldman received in 2001 and 2002, and thus a genuine dispute over whether

the IRS has reasonably determined the amount of tax owed. Accordingly, as explained below, the Court will deny the IRS' motion for summary judgment.

## I.

### A.

In or around 2001, Feldman's company began failing and Feldman resorted to making and using counterfeit checks to support himself. (ECF No. 40, PageID.298, 303.) For now, it suffices to say that Feldman used the fake checks to buy and short sell stocks. (*See* ECF No. 40-2, PageID.322–325.)

In 2001, Feldman and his wife divorced and so Feldman moved from the couple's home in Farmington Hills, Michigan to a new place in Southfield, Michigan. (ECF No. 40, PageID.304–305.) Feldman avers, "Contemporaneous with my divorce in 2001, I filed a Change of Address Form with the United States Post Office changing my address from 30100 Summit Dr., Farmington Hills, Michigan to 15605 George Washington, Southfield, Michigan 48075." (ECF No. 24, PageID.164.)

Although Feldman's bad-check scheme went on for a time, federal authorities eventually caught on. In August 2005, the federal government filed a criminal complaint against Feldman. The affidavit supporting the complaint indicated that Feldman was living at the Southfield address. (*See* ECF No. 24, PageID.172–173.) The 2005 case was dismissed without prejudice, but the federal government filed a second criminal case against Feldman in May 2006. *See United States v. Feldman*, No. 06-20301 (E.D. Mich. filed May 31, 2006). Feldman pled guilty to wire fraud in June 2006 and, in March 2007, was sentenced to 27 months in prison and $137,000 in restitution. *See id.*

Around this time, the Internal Revenue Service was also investigating Feldman. As relevant to the IRS' motion for summary judgment, Feldman had not filed tax returns for the 2001 and 2002 tax years. (ECF No. 24, PageID.164.) (The IRS also says Feldman owes around $1,000 for the 2015 tax year which, apparently, Feldman does not dispute.) In August 2006, the IRS sent Feldman a "Proposed Individual Income Tax Assessment" for the 2002 tax year. (ECF No. 18, PageID.103, 105.) The IRS mailed the proposed assessment to the Farmington Hills address. (*Id.*) As part of the mailing, the IRS listed seven payments from brokerage firms to Feldman. (ECF No. 18, PageID.103, 107–108.) According to the IRS, Feldman owed taxes on these seven payments. But according to the list, none of the payments were sent to the Farmington Hills address; they were all sent to a W. 12 Mile address, which was a UPS Store that Feldman's business (or former business) used for mail. (*See* ECF No. 18, PageID.107–108; ECF No. 24, PageID.170; ECF No. 40-2, PageID.300.)

In October 2006, the IRS received notice that documents it had sent to the Farmington Hills address had been returned "undelivered." (ECF No. 40, PageID.265 (2001 tax year), PageID.280 (2002 tax year).) Indeed, the IRS kept a computerized log for each tax investigation (one for 2001 and one for 2002) and both logs have an October 26, 2006 entry stating, "Undelivered Mail[.] Research needed." (ECF No. 40, PageID.265, 280.)

So the IRS conducted research into Feldman's current address. But the IRS has not provided the Court with any details about this investigation. (*See* ECF No. 40, PageID.265, 280.) All that is known is that by November 7, 2006, the research concluded with "no results." (*See id.*)

On December 4, 2006, the IRS sent notices of deficiency to Feldman for the 2001 and 2002 tax years. *See* 26 U.S.C. §§ 6212(a), 6213. Having found no other address for Feldman,

the IRS sent the two statutory notices to the Farmington Hills address. (ECF No. 15, PageID.71, 78; ECF No. 40, PageID.261, 273, 286.) The notice for the 2001 tax year indicated that brokerage firms had paid Feldman about $174,000, that Feldman owed the IRS about $47,000 in taxes for those payments, and that Feldman owed another $40,000 in interest and penalties. (ECF No. 15, PageID.74.) The notice for the 2002 tax year indicated that Feldman owed about $19,000 in taxes and another $9,000 in interest and penalties. (ECF No. 15, PageID.78; ECF No. 40, PageID.290.) The IRS calculated the $47,000 tax amount for the 2001 tax year and the $19,000 tax amount for the 2002 tax year using information supplied by brokerage firms to the IRS on 1099 forms (Form 1099-B, Form 1099-INT, and Form 1099-DIV). (*See* ECF No. 46, PageID.347–353.)

As Feldman had moved from his and his ex-wife's Farmington Hills home in 2001, the two notices were not sent to where Feldman was living in December 2006. Indeed, on the envelopes containing the notices, the postal service stamped, "Not Deliverable as Addressed[.] Forwarding Order Expired." (ECF No. 40, PageID.268 (2001 tax year); ECF No. 40, PageID.283 (2002 tax year).) At some point (most likely sometime in late December 2006 or early January 2007), USPS returned the notices to the IRS. (*See* ECF No. 40, PageID.268, 283.)

The two notices indicated that Feldman had 90 days to file a petition challenging the IRS' claim that he owed taxes, interest, and penalties for the 2001 and 2002 tax years. Apparently because Feldman never received the notices, he never filed a petition. The 90-day period expired in March 2007.

**B.**

The IRS filed this lawsuit just over 10 years later, on April 25, 2017. (Technically, the suit was filed by the Tax Division of the U.S. Department of Justice but, for convenience, the Court uses "IRS.") The IRS asserts that Feldman now owes around $200,000 in taxes, interest, and penalties. (*See* ECF No. 15, PageID.68 (indicating $193,000 owed as of November 2017).) And the IRS believes that every reasonable jury would agree with its assertion. So the IRS asks this Court to grant it summary judgment. (ECF No. 36.)

**II.**

Unfortunately, the parties in this case have put little effort into figuring out the proper summary-judgment burdens.

Usually, a defendant moves for summary judgment on a claim on which the plaintiff bears the burden of proof at trial. And in that common situation, the defendant discharges its initial burden by pointing out that one or more essential elements of the plaintiff's claim lack evidentiary support. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 507 (6th Cir. 2006). If the defendant identifies evidentiary gaps on essential elements, it puts the onus on the plaintiff to identify record evidence that would permit a reasonable jury to find for it on those elements. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

But sometimes a plaintiff moves for summary judgment on its claim or the defendant moves for summary judgment on an affirmative defense. In these and like situations, the moving party's initial burden is not merely to identify holes in the non-moving party's case. Instead, the moving party "must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out

the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *accord Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) ("In cases where the party moving for summary judgment also bears the burden of persuasion at trial, the party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." (internal quotation marks omitted)); Wright & Miller, 10A Fed. Prac. & Proc. § 2727.1 (4th ed.).

Here, the IRS filed this case to collect taxes, and it now seeks summary judgment. So it would appear that it has the more-demanding initial burden. But some of Feldman's arguments are best cast as affirmative defenses. Unfortunately, neither party explains how the summary-judgment burdens differ for different claims.

Fortunately, the Court can simplify things. Regarding the parties' primary dispute over the amount of taxes owed, the Court fleshes out the relevant burden of production and proof below. As for Feldman's argument that his "last known address" was the address on the change-of-address form he completed, the Court ultimately does not resolve that issue and thus need not resolve the associated burdens of production and proof. As for all other issues in this case, the Court will assume in Feldman's favor that the IRS has the more-demanding initial burden; this is because even under that summary-judgment standard, Feldman's evidence and arguments do not create a genuine dispute requiring a jury's resolution.

### III.

The Court begins with the IRS' evidence to determine whether it has discharged its initial burden. The Court then examines Feldman's rebuttal to determine whether he has shown that that there is a genuine dispute for trial.

**A.**

Focusing solely on the evidence supplied by the IRS (the Court turns to Feldman's rebuttal in the next section), every reasonable jury would find that Feldman owes what the IRS claims it is owed.

To start, the IRS has carried its initial burden on the amount Feldman received in 2001 and 2002. An IRS advisor declares that brokerage firms submitted Form 1099s to the IRS for the 2001 and 2002 tax years. (*See* ECF No. 46, PageID.347, 355–356, 350, 374–375.) The advisor further explains that the IRS treated the amounts listed on those 1099s as the amount that Feldman was paid by the brokerage firms in 2001 and 2002. (*See* ECF No. 46, PageID.347–353.) Although the 1099s are not part of the record, the IRS apparently entered the amounts from the 1099s into its computer system at some point. And a printout from that system indicates that in 2001, Feldman received eight payments from brokerage firms (ECF No. 40-1, PageID.266–267) and in 2002, Feldman received seven payments from brokerage firms (ECF No. 40-1, PageID.281–282). A "summary of income sources" document prepared by the IRS provides the amount of each of the eight payments in 2001; they total about $174,000. (ECF No. 40-1, PageID.279.) The IRS has not provided the Court with a comparable document for the 2002 tax year; but a "tax calculation summary" prepared by the IRS indicates that, in total, the 2002 payments were about $91,000. (ECF No. 18, PageID.105.) Thus, the IRS has shown—for purposes of its initial burden—that Feldman received $174,000 in 2001 and $91,000 in 2002.

The IRS has also carried its initial burden to show that it properly computed taxes based on the amount received. The same IRS advisor indicates that the $174,000 and $91,000 amounts were treated as Feldman's "adjusted gross income" for 2001 and 2002 (respectively).

She further avers, "the IRS calculated [Feldman's] income tax liability for each year, allotting him the standard deduction and personal exemption." (ECF No. 46, PageID.352.)

Aside from evidence on the amount of taxes that Feldman owes, the IRS has also produced evidence indicating that it adequately notified Feldman of his tax deficiency. The logs associated with the tax investigation indicate that the IRS conducted some research into Feldman's whereabouts in 2006 and came up with no better address than the Farmington Hills address. (*See* ECF No. 40, PageID.265, 280.) And the IRS has shown that it sent the statutorily required notices of deficiency to that address. (ECF No. 15, PageID.71, 78; ECF No. 40, PageID.261, 273, 286.)

Finally, the IRS has largely brought things up to date. A declaration of another IRS advisor states that with taxes, penalties, and interest, and as of as of November 1, 2017, Feldman owes the IRS about $138,000 for the 2001 tax year, around $54,000 for the 2002 tax year, and $960 for the 2015 tax year. (ECF No. 15-3, PageID.68.)

Based on only this evidence, every reasonable jury would find that Feldman owes the IRS the amount claimed by the IRS, which, as of February 2020, is around $200,000.

### B.

So the question becomes whether Feldman's evidence and arguments would be sufficient to persuade a reasonable jury otherwise. He tries hard: he makes 11 arguments against the grant of summary judgment. One has merit. And the Court starts with that one.

### 1.

Feldman asserts that there is a genuine dispute over the amount of taxes he owes. A review of the evidence indicates that Feldman is correct.

Start with the IRS' evidence of Feldman's income in 2001 and 2002. As just discussed, an IRS advisor avers that brokerage firms sent the IRS 1099 forms for the 2001 and 2002 tax years. (ECF No. 46, PageID.347.) Setting aside the 1099s for interest payments and dividend payments (they are immaterially small amounts), the key form is 1099-B. The advisor avers, "By filing a 2001 Form 1099-B, each broker informed the IRS that it sold stocks and bonds for Joseph Feldman in 2001 and that it *paid* the gross proceeds of the sale (*the amount specified on the form* including or excluding commissions) to Mr. Feldman in 2001." (ECF No. 46, PageID.348 (emphasis added).) The IRS Advisor makes an identical averment with respect to the 2002 tax year. (ECF No. 46, PageID.350.) Apparently, the amounts on the 1099-Bs added up to approximately $174,000 for the 2001 tax year and $91,000 for the 2002 tax year. Treating these amounts as Feldman's income, the IRS then determined that Feldman owed about $47,000 in taxes for the 2001 tax year and $19,000 for the 2002 tax year. (*See* ECF No. 40, PageID.277, 290.)

But Feldman has submitted an affidavit too. And in his affidavit, he swears that the amounts on the 1099-Bs were not what he was paid by the brokerage firms, instead only the "total sale price of the securities." (ECF No. 44, PageID.340.)

And Feldman's assertion is not unadorned, either. To the contrary, between his affidavit and his sworn testimony, Feldman has explained in detail why he believes that the 1099-Bs did not show total amounts he received from brokerage firms but instead showed the amounts the stock was sold for. According to Feldman, portions of the stock sale proceeds were used to reimburse the broker for the counterfeit checks and he would then receive any remaining proceeds. (ECF No. 44, PageID.340.)

An example is the easiest way to understand Feldman's explanation of the 1099-Bs. Assume that in 2001, Feldman funded an account with Brokerage Firm A using a $10,000 counterfeit check and that he also funded an account with Brokerage Firm B using another $10,000 counterfeit check. (*See* ECF No. 40-2, PageID.324.) And assume that, through Firm A, Feldman bought 100 shares of XYZ Corp. stock at $100 per share (i.e., spending all $10,000 in the account). (*See* ECF No. 40-2, PageID.324; ECF No. 44, PageID.339.) And further assume that, through Firm B, Feldman took the opposite position, short selling $10,000 worth of XYZ Corp. stock. (*Id.*) (On a short sale, the investor borrows shares from a brokerage firm, sells them, and then tries to repurchase the shares at a lower price before he is required to return the shares to the firm.) If the price of XYZ Corp. stock went up to $110 per share, the account with Firm A would have a profit of $1,000 (less brokerage fees and the like), while the account with Firm B, the short-sale account, would have an equivalent loss ($1,000). But if XYZ Corp. stock went down to $90 per share, the account with Firm B would have a profit of $1,000 (less brokerage fees and the like), while the account with Firm A, the stock-purchase account, would have an equivalent loss ($1,000). (ECF No. 40-2, PageID.325; ECF No. 44, PageID.339.) Feldman explains that within a few days or at most a couple weeks, the brokerage firms would discover that their accounts had been funded with fake checks. (ECF No. 44, PageID.339.) At that point, the firms would liquidate the holdings in the account to recover the amount of the fake checks. (ECF No. 44, PageID.340.) The firms would then close the accounts. (*Id.*) Returning to the example, if the price of XYZ Corp. stock went up from $100 to $110 per share, the liquidation of the stock in the account with Firm A would result in $11,000. Firm A would take $10,000 to recover for the bad check, leaving $1,000 profit in the account. (ECF No. 40-2, PageID.325; ECF No. 44, PageID.340.) Firm A would either refund the $1,000 to

Feldman upon closing the account or Feldman would withdraw that amount before Firm A closed the account. (ECF No. 44, PageID.340; ECF No. 40-2, PageID.325.) As for the short-sale account, Firm B would only recover $9,000 via liquidation, meaning it was out $1,000. (*Id.*) Feldman would simply not pay that shortfall, leaving Firm B to try to collect from him. (*Id.*) So, in this example, Feldman's profit would be $1,000 (less trading fees and the like) from Firm A. Yet, Firm A would have sold $11,000 in stock. Thus, Feldman claims, the 1099-B filed by Firm A would reflect $11,000 even though he only received $1,000. And, says Feldman, the IRS computed taxes based on the $11,000 in sales, not his actual income of $1,000.

Feldman's theory has some corroboration. The Court has conducted its own research into what 1099-Bs show. As it turns out, prior to 2011, 1099-Bs did not include the cost basis of the stock. *See* Rich White, *How to Explain the New Cost Basis Reporting Rules to Your Clients*, Benefits Pro (Nov. 29, 2011), https://bit.ly/38O7oX8; Kay Bell, *Form 1099-B Now Has Cost Basis Information*, Bankrate, (Feb. 27, 2012) https://bit.ly/2GGrCG7; IRS.gov, *Cost Basis FAQs for Form 1040 filers*, https://bit.ly/2S6Hg2X (last visited Jan. 31, 2020). Thus, it seems possible, as Feldman claims, that the 1099-Bs merely reflected the sales of stock and not the amount of money he actually received.

The competing evidence creates a genuine dispute for a jury's resolution. The IRS swears that the amount on the 1099-Bs is what Feldman was paid by brokerage firms. (ECF No. 46, PageID.348, 350.) Feldman swears that is not so: "[t]he amount I actually received was far less than what was reported on the 1099s, due to the fact that the 1099s report the total sale price of the securities." (ECF No. 44, PageID.340.) And Feldman backs his claim with an explanation for why the 1099s would be overreporting the amount he received. And the IRS

has offered no evidence contrary to Feldman's averment that brokerage firms would sell all his stock to cover their losses for the fake checks. So the issue is essentially who's correct about what the 1099-Bs show—payments or stock sales—and, on this record, who's right depends on who to believe—the IRS or Feldman. Credibility determinations are for a jury, not a Court on summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In its briefs, the IRS stresses that there is a presumption of correctness that attaches to its assessment. The IRS says there are a legion of cases stating that its calculation of the amount of taxes owed is presumptively correct and that the burden is on the taxpayer to show that the amount is unreasonable. (ECF No. 15-2, PageID.55–56, 58.) The IRS points out that even if quite imprecise, its calculation of the amount owed is entitled to deference because it is the taxpayer who, by not filing a return and not keeping records, prevents a precise calculation. (ECF No. 15-2, PageID.59.)

In this case, the presumption of correctness does not carry the day for the IRS. This case is about income received: Feldman says he only received what was left over after his stock was liquidated and the firm covered its losses while the IRS says that Feldman received all the amount on the 1099-Bs. The Sixth Circuit has explained that where the issue is income received, the taxpayer's burden to rebut the presumption of correctness is not particularly heavy. As opposed to say, the burden of proving entitlement to a deduction, "[w]here the taxpayer is confronted with the daunting task of proving that he did not receive income attributed to him in an assessment, . . . [we have] established a less severe rule." *United States v. Walton*, 909 F.2d 915, 918 (6th Cir. 1990). "Where it is a negative assertion that a successful taxpayer would have to prove the law imposes much less of a burden upon a taxpayer. Reasonable denials of the assessment's validity have sufficed in such cases to shift the burden

back to the government. The government then bears the task of substantiating its assessment in cases of this type." *Id.* (internal citations and quotation marks omitted).

Although one reason for the lower "reasonable denial" burden is not implicated here, the Court still believes that standard applies. In *United States v. Besase*, the Sixth Circuit suggested that the taxpayer's burden to prove he did not receive income should not be heavy because if it were, a taxpayer might be forced to waive his Fifth Amendment privilege. *See* 623 F.2d 463, 466 (6th Cir. 1980) ("To show error in the [tax] assessment, the taxpayer may have no choice but to divulge the inculpating details of his wagering operation and thus expose himself to state prosecution."). But the Sixth Circuit has applied the lower, "reasonable denial" burden twice in cases where there were not concerns that the privilege would be waived in the course of contesting taxes owed. *See Weir v. Comm'r*, 283 F.2d 675, 677 (6th Cir. 1960) (applying lower burden where dispute was over whether checks were personal or business); *United States v. Hammon*, 277 F. App'x 560, 562 (6th Cir. 2008) (applying lower burden where taxpayer had already pled guilty by the time of civil tax case). Indeed, the seminal Sixth Circuit case setting out the lower burden did not involve the Fifth Amendment. *Weir*, 283 F.2d at 679. Moreover, Feldman's burden in this civil tax case should not change based on the timing of his unrelated criminal proceedings (i.e., that he would have a lower burden had the IRS acted sooner, but a higher burden because the IRS acted later).

*United States v. Hammon*, 277 F. App'x 560 (6th Cir. 2008), illustrates how the "reasonable burden" standard should be applied. There, David Hammon ran an illegal gambling business from 1984 to 1988 and pled guilty in 1990. *Id.* at 561. In 1995, the IRS assessed Hammon for not paying "wagering excise taxes" in 1986, 1987, and 1988; the IRS claimed that Hammon owed it $2.4 million. *Id.* at 562. But $2.4 million could only be be

correct if Hammon accepted wagers of $1.6 million per month. *See id.* Hammon testified as follows:

> Q. In January of 1986, did you accept during the month of January, 1986, $1 million or $2 million in bets?
>
> A. No. No, sir, I did not.
>
> Q. How much did you accept?
>
> A. I can't really tell you legitimately. . . . how could I possibly remember what I did 20 years ago? And the numbers are outrageous.
>
> Q. Why are the numbers outrageous? Why would you say that?
>
> A. Because it's a million dollars, million plus in one month, that's $250,000 a week. That's a lot of money. No, I never did that kind of— . . . . In 1986, I—I took some bets, a thousand or two a game.

*Hammon*, 277 F. App'x at 564. The district court denied the IRS summary judgment, and the Sixth Circuit affirmed. *See id.* Because the IRS had lost the records it used to calculate the $2.4 million figure, it was "impractical and inequitable to require Hammon to produce documents or other evidence to prove his negative assertion." *Id.* And the Sixth Circuit credited the district court's determination that "Hammon's testimony was not vague or conclusory; Hammon's denial was based on his perception of the probable inaccuracy of a calculation of what the Government claimed he had been making as a bookmaker seventeen years earlier." *Id.*

This case is a lot like *Hammon*. Like *Hammon*, the dispute in this case is over income received. Like *Hammon*, the IRS seeks to collect taxes on income earned 15 years before it filed suit. As it was for Hammon, it is "impractical and inequitable" for Feldman to produce documents "to prove his negative assertion." And Feldman's explanation for why the IRS' assessment is incorrect—that he only earned a fraction of the stock sold—is at least as plausible as Hammon's vaguer denial about the amount of wagers he took per month.

In short, a reasonable jury could find that Feldman's affidavit constitutes a "reasonable denial" of the income that the IRS says he earned in 2001 and 2002.

**2.**

Feldman argues that he did not receive the statutorily required notice of his tax deficiencies.

Some background law is necessary to appreciate this argument. Before assessing or collecting taxes, the IRS must send a notice of deficiency to the taxpayer's "last known address." *See* 26 U.S.C. §§ 6212(a), 6212(b)(1), 6213(a). "Last known address" is a term of art. By default, "a taxpayer's last known address is the address that appears on the taxpayer's most recently filed and properly processed Federal tax return." 26 C.F.R. § 301.6212–2(a). But a taxpayer can change his last known address by providing the IRS with a "clear and concise notification" of a different address. *Id.* Further, "[t]he IRS *will* update taxpayer addresses maintained in IRS records by referring to data accumulated and maintained in the United States Postal Service (USPS) National Change of Address database that retains change of address information for thirty-six months (NCOA database)." 26 C.F.R. § 301.6212–2(b)(2) (emphasis added). Indeed, "if the taxpayer's name and last known address in IRS records match the taxpayer's name and old mailing address contained in the NCOA database, the new address in the NCOA database *is* the taxpayer's last known address." *Id.* (emphasis added). The new address in the NCOA database remains the taxpayer's last known address until "[t]he taxpayer files and the IRS properly processes a Federal tax return" with a different address or the taxpayer provides the IRS with "clear and concise notification" of a different address. *Id.*

Feldman relies on this law to argue that a reasonable jury could find that the IRS did not send notices to his "last known address." In particular, he avers (and the IRS does not

dispute) that he submitted a change-of-address form to the Postal Service in 2001 when he moved from Farmington Hills to Southfield. (ECF No. 24, PageID.164.) And Feldman points out that the regulation states, "the new address in the NCOA database is the taxpayer's last known address."

In response, the IRS points to the condition precedent: "*if the taxpayer's name and last known address in IRS records match the taxpayer's name and old mailing address contained in the NCOA database*, the new address in the NCOA database is the taxpayer's last known address." 26 C.F.R. § 301.6212–2(b)(2) (emphasis added). According to the IRS, "the IRS computer records showed no change of address. Perhaps this was caused by that fact that [Feldman] has used several different versions of his name, and the names used by the USPS and the IRS did not match. . . . [Feldman] has two middle names (Sergi Elton), and he sometimes uses Elton alone, both names, and both names hyphenated." (ECF No. 40, PageID.252.) Feldman does not recall how his name appeared on the change of address form.

Whether a jury should resolve the parties' dispute about Feldman's "last known address" in 2006 turns in part on how the IRS updates its records using the Postal Service's NCOA database. Fortunately, commentary associated with the final version of the last-known-address regulation says how. *See Definition of Last Known Address*, 66 Fed. Reg. 2817-01 (Jan. 12, 2001). According to the commentary, the IRS has its own copy of the NCOA database and the Postal Service provides the IRS with weekly updates to the database. *Id.* at 2817. When the IRS receives the weekly update, a computer program compares "key elements of existing taxpayer address information maintained in IRS records to an extract of the same elements" in the update. *Id.* at 2818. The key elements include the "primary house number, secondary number, secondary designator, and nine digit zip code." *Id.* If these key elements match, then

the IRS (apparently a person and not a computer) compares the complete address information in IRS records against the complete address information in the weekly update to determine if there is a match. *Id.* The commentary states: "A match will *only be made if* the taxpayer's name in IRS records is the same, *within certain tolerances*, as is found in the NCOA database." *Id.* (emphases added). The commentary also provides that the IRS planned to "annually compare all taxpayer address records maintained in the IRS's automated masterfile with the full thirty-six month NCOA database for purposes of updating the IRS's mailing list." *Id.* But "[a]s with the weekly updates, the names must be the same, *within certain tolerances*, in both the IRS's records and the NCOA database." *Id.* (emphasis added).

Coupling the regulation's commentary with the evidence of record leads to two possibilities. It is undisputed that Feldman submitted a change-of-address form with the Southfield address to the Postal Service. It also is undisputed that IRS records were never updated with the Southfield address. So the first possibility is that the name and address on the change-of-address matched, "within certain tolerances," the name and address in IRS records, but the computer program or IRS agent made a mistake during comparison. The second possibility is that the name and address that Feldman wrote on the form varied too greatly from that in the IRS' records, i.e., the variance was beyond "certain tolerances."

That said, the Court ultimately need not and does not decide this issue. Feldman has not sought summary judgment and thus does not claim that, as a matter of law, he did not receive statutorily required notice. The IRS has sought summary judgment, but the genuine dispute over the amount owed precludes the Court from granting the IRS that relief. In other words, even if the IRS is correct that, as a matter of law, notices of deficiency were sent to

Feldman's "last known address," the IRS would not be entitled to summary judgment. Accordingly, the Court need not decide this issue.

That also holds true for the remaining issues addressed in this opinion. But the remaining issues are both straightforward and largely legal (as opposed to factual) in nature. So the Court addresses the issues to streamline trial.

3.

Feldman makes a second argument about the notices of deficiency: he argues that the IRS "knew, or should have known," that he was not living at the Farmington Hills address when it sent the notices in 2006. (ECF No. 24, PageID.147.) Although related, this argument is not about Feldman's "last known address" in 2006. Instead, it appears that Feldman argues that even if the Farmington Hills address was his "last known address" as that term is used in 26 U.S.C. § 6212, the IRS knew (or should have known) that he could not be reached at that address. Feldman points out that some of the documents that the IRS mailed indicated payments to the W. 12 Mile address, that federal agents knew in 2005 that he was living at the Southfield address and arrested him there, that he provided his address to the federal government (pretrial services) as part of his bond conditions, and that he was on supervised release in 2006 and thus under the federal government's supervision. (*See* ECF No. 24, PageID.147–148, 150–151.)

There is some equitable appeal to Feldman's knew-or-should-have-known argument, especially where the IRS acknowledged in its computer logs that documents sent to the Farmington Hills address had been returned "undelivered" (*see* ECF No. 40, PageID.265, 280) before it sent the statutory notices to the Farmington Hills address in December 2006.

Perhaps because of a sense of equity, the Fifth Circuit has held that where the IRS learns that notices of deficiencies (or like documents) have been returned "undelivered," the IRS must make a reasonable effort to discover the taxpayer's current address.

Take *Terrell v. Commissioner of Internal Revenue*, 625 F.3d 254 (5th Cir. 2010), for example. There, shortly after filing an innocent-spouse-relief form with the IRS, the taxpayer moved to a new home. *Id.* at 257. The IRS sent three documents about the taxpayer's request for relief to the taxpayer's old address. *Id.* Despite the fact that each of the three documents was returned undelivered, the IRS sent a notice starting the 90-day clock to petition the tax court to the undeliverable address. *Id.* The Fifth Circuit reasoned that "last known address" is the address that the "IRS *reasonably* may consider to be the address of the taxpayer." *Id.* at 259 (emphasis added). Thus, "[w]hen the IRS knows or should know at the time of mailing that the taxpayer's address on file may no longer be valid because of previously returned letters, 'reasonable diligence' requires further investigation." *Id.* Because the IRS had not done any investigation after three documents were returned undelivered, the IRS did not exercise reasonable diligence. *Id.* at 260. It followed, said the Fifth Circuit, that the 90-day notice was not sent to the taxpayer's "last known address." *Id.*

The Seventh Circuit, however, has questioned whether there should be equitable considerations engrafted onto the statutory term "last known address" and further found that if any equitable test exists, equity does not favor a taxpayer who neglects to file tax returns and moves frequently during the period of non-filing. In *Gyorgy v. Commissioner of Internal Revenue*, 779 F.3d 466 (7th Cir. 2015), Christopher Gyorgy did not file tax returns for several years and moved several times during the same period. *See id.* at 468–69. By the time the IRS sent a notice of deficiency to the address on Gyorgy's most recent return, the IRS was aware

that other mail it had sent to that same address had been returned as "not deliverable." *See id.* at 469. The taxpayer urged the Seventh Circuit to follow two Fifth Circuit decisions, one of which was *Terrell*. *See id.* at 478. The Seventh Circuit noted, "There is a tension between these two decisions and the applicable Treasury regulation, which requires a new tax return or clear and concise notification to change the last known address and which provides that a new address obtained from a third party (other than the NCOA database) is not sufficient." *Id.* at 479 (internal citations omitted). But, said the Seventh Circuit, even if it were to follow the Fifth Circuit's approach, that approach would not help Gyorgy. The Court explained that the IRS' duty of reasonable diligence is "rooted in equity" and "Gyorgy . . . neglected to file his tax returns year after year, moved frequently, and left the IRS in the dark concerning his whereabouts." *Id.* As such, Gyorgy was "in no position to complain that the IRS should have done more to track him down" and the IRS was entitled to rely on the address it had on file. *Id.* at 480.

On the facts of this case, the Court finds the Seventh Circuit's approach persuasive. First, there is some tension between, on the one hand, requiring the IRS to conduct a search into the taxpayer's current whereabouts, and, on the other hand, the text of the statutes and regulations. The statute says that a notice of deficiency "shall be sufficient" if it is mailed to the taxpayer's "last known address." 26 U.S.C. § 6212(b)(1). Then, the implementing regulation states that "a taxpayer's last known address *is* the address that appears on the taxpayer's most recently filed and properly processed Federal tax return, *unless* the [IRS] is given clear and concise notification of a different address." 26 C.F.R. § 301.6212-2(a) (emphases added). The regulation then goes on to say that "change of address information that a taxpayer provides to a third party, such as a payor or another government agency, is *not* clear

and concise notification." 26 C.F.R. § 301.6212-2(b)(1). But as discussed, there is one exception to this third-party rule: the Postal Service's NCOA database. 26 C.F.R. § 301.6212-2(b)(1). Summarizing all of that, the statute says that notice sent to a taxpayer's "last known address" suffices and the implementing regulation says that the "last known address" is one of three things: the address on the most recently filed, properly processed tax return, the address provided to the IRS via "clear and concise" notice, or the address in the NCOA database (if the NCOA database name and address matches that in IRS records). Arguably then, the statute and implementing regulation specify the single address to which the IRS is required to send notices and they provide that sending notices to that address is enough.

But, like the Seventh Circuit in *Gyorgy*, this Court can put off deciding whether the IRS has a duty to investigate when it knows the taxpayer's "last known address" is not an address where the taxpayer can be reached. That is because even if the IRS should investigate when it knows that the "last known address" is stale, the IRS did enough in this case.

Here, unlike in *Terrell*, the IRS put in some effort to locate Feldman. After receiving notice that mail sent to Farmington Hills had been returned undelivered, and before sending the notices of deficiency, the IRS conducted a search into Feldman's whereabouts. It could find no better address for Feldman. True, the United States Attorney for the Eastern District of Michigan knew where to find Feldman in 2006. But the Executive Branch's many arms sometimes work independently. *See United States v. Navolio*, 334 F. App'x 204, 209 (11th Cir. 2009) ("[T]here is no evidence that IRS agents in the civil division had actual knowledge at the time they issued the deficiency notices that Navolio was incarcerated for securities fraud and cooperating with the [Criminal Investigation Division] in tax crimes prosecutions.

Although Navolio had contact with IRS agents in the CID during this time, the criminal and civil divisions ordinarily do not communicate with each other.").

And if the IRS' duty to search is rooted in equity, it is worthwhile to note that Feldman is significantly to blame for the stale address: Feldman did not file tax returns for several years. Feldman avers, "Because I did not have sufficient gross income in excess of the standard deduction and personal exemption amounts, I did not file income tax returns [for] 2001 and 2002." (ECF No. 24, PageID.164.) But that only explains why Feldman did not file tax returns in April 2002 and April 2003. What about 2004, 2005, and 2006? Feldman does not say.

In short, the notices of deficiency the IRS mailed to Farmington Hills are not insufficient. simply because the IRS knew or should have known that Feldman could not be reached there.

**4.**

Feldman also argues that the notices of deficiency were not sent, as statutorily required, by "certified mail or registered mail." (ECF No. 24, PageID.146.) But in response to this argument, the IRS has produced the mailed envelopes and they state "certified mail." (ECF No. 40-1, PageID.268; ECF No. 40-1, PageID.283.) Thus, this argument does not present a genuine dispute requiring a jury's resolution.

**5.**

In his initial summary-judgment brief, Feldman argued that the IRS had not adequately documented the taxes he allegedly owes. (ECF No. 24, PageID.153.) In his second summary-judgment brief, it appears that Feldman has abandoned this argument. (*See* ECF No. 37, PageID.233.) In any event, Feldman cites no law in support of his claim that the IRS was

required to provide more documentation than it did. And, arguably at least, there is not more documentation because Feldman did not file taxes for several years.

**6.**

Feldman next says that the IRS assessed taxes too late. Under the tax code, taxes "shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed)[.]" 26 U.S.C. § 6501(a). Feldman argues that his 2001 tax return was due in April 2002 and his 2002 tax return was due in April 2003. Yet the IRS assessed taxes in 2007, beyond the three-year period set out in § 6501(a). (ECF No. 24, PageID.156.)

But Feldman never filed a return. So, according to another subsection of the very section Feldman cites, there was no three-year clock: "In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, *at any time*." 26 U.S.C. § 6501(c)(3) (emphasis added).

Recognizing that he never filed a return for 2001 or 2002, Feldman attempts some linguistic gymnastics. (ECF No. 24, PageID.156–157.) He points out that the tax code states, "the term 'return' means *the return required to be filed by the taxpayer* (and does not include a return of any person from whom the taxpayer has received an item of income, gain, loss, deduction, or credit)." 26 U.S.C. § 6501(a) (emphasis added). Latching onto the emphasized language, Feldman argues that he "did not have sufficient gains and/or other income to require filing a tax return for 2001 or 2002" so there was no "return required to be filed by the taxpayer." (ECF No. 24, PageID.157.)

But if Feldman's interpretation of § 6501(a) is correct, and if there was no "return required to be filed by the taxpayer," then there was no "return" within the meaning of § 6501(a); after all, the statutory language defines a "return" as "the return required to be filed

by the taxpayer." And if there was no "return" within the meaning of § 6501(a), then how can Feldman rely on its three-year clock? Under subsection (a), the clock starts with the filing of a "return." In other words, Feldman's argument defeats itself.

**7.**

Aside from claiming that the IRS assessed taxes too late, Feldman also argues that the IRS sought to collect them too late. (ECF No. 24, PageID.158.) The tax code provides, "Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun—(1) within 10 years after the assessment of the tax . . . ." 26 U.S.C. § 6502. Feldman argues that the notices of deficiency were sent on December 6, 2006, and so he only had 90 days from then, until March 4, 2007, to challenge the alleged deficiency. In Feldman's view, March 4, 2007, was the date of assessment. (ECF No. 24, PageID.158.) And, Feldman points out, the Government did not file this suit until April 25, 2017—more than 10 years after the March 4, 2007 date. So, Feldman concludes, the IRS' collection efforts are too late. (ECF No. 24, PageID.158.)

This argument is factually and legally flawed. Factually, the transcript of "Certificate of Assessments, Payments, and Other Specified Matters" indicates that the 2001 and 2002 taxes were assessed on April 30, 2007. (ECF No. 15, PageID.81–82, 89; *see also* ECF No. 15, PageID.66.) And with that assessment date, the IRS' suit was filed timely (albeit by days). Legally, Feldman again ignores the statute: "In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, *at any time*." 26 U.S.C. § 6501(c)(3) (emphasis added).

**8.**

Out of luck with the statutory text, Feldman retreats to common law. He says that the IRS' suit is barred by laches. (ECF No. 24, PageID.159.)

Although the Court appreciates that the IRS waited 5 years to assess taxes and then another 10 years to collect them (all the while allowing interest and penalties to rack up), Feldman's laches defense is ultimately unpersuasive. For one, it appears that laches cannot bar the United States' efforts to collect taxes. *See United States v. Summerlin*, 310 U.S. 414, 416 (1940) ("It is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights"); *United States v. Cohn*, 682 F. Supp. 209, 224 (S.D.N.Y. 1988) (applying *Summerlin* to reject laches defense in tax-collection case). For two, courts do not usually apply laches when there is still time on the statute-of-limitations clock. *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 233 (6th Cir. 2007) ("Only rarely should laches bar a case before the . . . statute has run."). And so § 6501(c)(3)'s "at any time" language again thwarts Feldman.

**9.**

Feldman believes that the IRS incorrectly classified his profits from stock trading as capital gains (and thus wrongly subjected the money to capital gains tax). (*See* ECF No. 37, PageID.239.) He makes three arguments to this effect.

Feldman first argues that the money he received from stock trading was not subject to capital gains tax because the shares in his fraudulently funded accounts were not "capital assets." (ECF No. 37, PageID.234.) Under the code, a capital gain results "from the sale or exchange of a capital asset." 26 U.S.C. § 1222(1), (3). In turn, "capital asset" is "property held by the taxpayer." 26 U.S.C. § 1221(a). Feldman cites *Miller v. Commissioner of Internal*

*Revenue*, 299 F.2d 706, 708 (2d Cir. 1962), for the proposition that "[m]ost people trained in the law would agree that for many purposes one may define 'property' as a bundle of rights, protected from interference by legal sanctions." Putting *Miller* and the definition of "capital asset" together, Feldman argues, "for property to be classified as a capital asset," "a taxpayer needs to have some protectible property interest under local law." (ECF No. 37, PageID.234.) But, says Feldman, he had no such protectible property interest in the stocks he traded because he acquired them fraudulently. (ECF No. 37, PageID.235.) Thus, Feldman argues, he did not have any "capital assets." It follows, in Feldman's view, that the IRS could not tax the money he received from the brokerage firms in 2001 and 2002 as capital gains. (ECF No. 37, PageID.236.)

This highly technical argument is unavailing. Feldman would like the Court to rewrite the definition of "capital asset" from "property held by the taxpayer," 26 U.S.C. § 1221(a), to "property [lawfully] held by the taxpayer." But Congress, not a federal court, writes statutes. And here, the Court is especially disinclined to modify the statutory text in the way that Feldman desires because it is well established that taxes are owed on unlawfully obtained income. *See Rutkin v. United States*, 343 U.S. 130, 137 (1952) ("An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it."); *Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (noting the "well-established tax principle that unlawful earnings come within the meaning of the term 'gross income' and are thus taxable"); *Collins v. Comm'r*, 3 F.3d 625, 632–33 (2d Cir. 1993) ("[T]axing an embezzler on his illicit gains accords with the fair administration of the tax law because it removes the anomaly of having the income of an honest individual taxed while the similar gains of a criminal are not.").

And the facts of *Miller*, the sole case Feldman cites in support of his "I possessed no sticks from the bundle of rights" argument, are very different than the facts of this case. There, the taxpayer sought to have money derived from her deceased husband's fame cast as "property" so that she could treat that money as a "capital asset" (and thus be taxed at a lower rate than ordinary income). *See* 299 F.2d at 707. The court found that the law had never recognized a surviving spouse's property interest in the fame of a deceased spouse. *Id.* at 710. Here, the law does recognize property rights in stocks. Feldman's distinction turns on whether the stocks were lawfully or unlawfully bought and sold. In *Miller*, there was no recognized property right—period. Whether the interest was obtained legally was simply not at issue in *Miller*.

### 10.

Undeterred, Feldman offers a second argument for why the stocks he traded were not "capital assets" (and thus the profits from them were not subject to capital gains treatment). To understand this second argument, a summary of the only case Feldman cites in support of this argument is in order.

In *Corn Products Refining Co. v. Commissioner of Internal Revenue*, 350 U.S. 46 (1955), a drought and the corresponding hike in the price of corn caused supply problems for Corn Products Refining (as the company's name suggests, it made products by refining corn). *Id.* at 48. To prevent the supply problem from happening again, Corn Products entered into contracts to buy a specified amount of corn at a specified price on future dates, i.e., it bought commodity futures. *Id.* at 47–48 & n.1. Corn Products argued that "its futures were 'property' entitled to capital-asset treatment." *Id.* at 50. The Supreme Court disagreed. The Court explained that the company's futures were "vitally important to the company's business as a

form of insurance against increases in the price of raw corn." *Id.* Indeed, the purchase of corn futures was arguably just a cheaper alternative to building more silos to store more corn. *Id.* The Court noted testimony from Corn Products' officers that "in entering [the futures] market the company was 'trying to protect a part of [its] manufacturing costs'" and that the company's entry into the market "was not for the purpose of 'speculating and buying and selling corn futures.'" *Id.* at 51. For these and other reasons, the Court held that Corn Products' futures were not "capital assets" under the tax code.

Feldman thinks his stock trading was just like Corn Products' futures trading. He argues that he did not trade stocks for investment purposes. (ECF No. 37, PageID.237.) According to Feldman, his company had failed and so he "created [a] 'bad check enterprise' to pay for his expenses and sustain a living, and it was not in his books to develop it into an ongoing investment project." (ECF No. 37, PageID.237.) Feldman says he was "exactly the type of 'self-insurer' against whom the Supreme Court in *Corn Products* cautions." (*Id.*)

The Court disagrees. The futures that Corn Products held were effectively insurance or, in truth, just one step in its manufacturing process (i.e., obtaining corn at a reasonable price). *See Corn Prod.*, 350 U.S. at 50 ("We find nothing in this record to support the contention that Corn Products' futures activity was separate and apart from its manufacturing operation."). By contrast, Feldman purchased stock and short sold stock to take advantage of a change in the value of the stock. Unlike Corn Products, Feldman did not buy stocks to ensure that an essential step of his business would be completed. Moreover, as Feldman himself argues, the unlawful stock trading was his income. *See Corn Prod.*, 350 U.S. at 52 ("The preferential treatment provided by [§] 117 [for capital assets] applies to transactions in property which are not the

normal source of business income."). The Court thus finds *Corn Products* to be an ill fit with the facts of this case.

**11.**

Feldman further argues that the IRS improperly taxed the payments from brokerage firms as capital gains because he did not lawfully buy or sell the stock. The tax code states that capital gains are gains "from the *sale or exchange* of a capital asset." 26 U.S.C § 1222(1), (3) (emphasis added). Feldman argues that when a series of transactions are part of a larger plan, courts focus on the larger plan and not the series of transactions. (*See* ECF No. 37, PageID.238.) Feldman argues that the stocks he bought and sold were "only a small part of a bigger fraudulent scheme." (ECF No. 37, PageID.238.) So in Feldman's view, the focus should be on his larger plan. And with that perspective, Feldman argues, "[he] did not engage in a sale or exchange so as to fulfill the 'sale or exchange' requirement" of § 1222(1), (3). (ECF No. 37, PageID.238–239.)

This argument is unpersuasive. Feldman cites a 65-year-old case in support of his argument. In relevant part, the opinion states, "courts have generally enunciated the rule that where the essential nature of a transaction is the acquisition of property, it will be viewed as a whole and closely related steps will not be separated either at the instance of the taxpayer or the taxing authority[.]" *Georgia Props. Co. v. Henslee*, 138 F. Supp. 587, 590 (M.D. Tenn. 1955). But *Georgia Properties* did not involve § 1222 let alone § 1222's "sale or exchange" language. (The case involved the purchase of a building through a series of transactions, including the purchase of all stock in the company that owned the building. *Id.* at 588.) As such, the Court is simply not persuaded that it or the IRS should overlook Feldman's purchases and sales of stock and focus only on his larger scheme. Indeed, many people trade stocks as

just one part of a larger income, retirement, or business plan—Congress would likely be surprised to learn that § 1222's "sale or exchange" language does not capture these individuals' stock trading.

## IV.

For the reasons stated, the IRS' motion for summary judgment (ECF No. 36) is DENIED. The case will proceed to trial because there is a genuine dispute over the amount of taxes that Feldman owes the IRS. The parties may also argue at trial that his "last known address" was the address on the change-of-address form he completed in 2001. Unless Feldman has new law or evidence, Feldman's other 9 arguments should not be made to the jury.

SO ORDERED.

Dated: February 12, 2020

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE